UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| ROBERTO EDMUNDO VIDAL | : | |
| Debtor | : | Bankruptcy No. 10-14071 |
| _____ | | |
| LL LIFESTYLE, INC. | : | |
| Plaintiff[1] | : | |
| v. | : | |
| ROBERTO EDMUNDO VIDAL | : | Adversary No. 10-0335 |
| Defendant | : | |

..................................................

OPINION

..................................................

In the above-captioned adversary proceeding, the plaintiff, LL Lifestyle,
Inc. ("LL Lifestyle"), seeks to have declared nondischargeable, under 11 U.S.C. §
523(a)(2), (a)(4) and/or (a)(6), an unliquidated, disputed debt owed by the debtor, Mr.
Roberto Vidal.  The debtor opposes such relief.

The parties' dispute, which has been pending for a number of years, arises
from the debtor's investment in LL Lifestyle, a New York corporation, and the ultimate
purchase of a yacht by VP Maritime, Inc., an entity controlled by the debtor (and a non-
debtor individual).  In essence, LL Lifestyle complains that the debtor promised to
purchase a yacht for use by it, but instead, while serving as a director of LL Lifestyle,

---

[1]By order dated November 4, 2011, Mr. Donald Choi was dismissed as plaintiff
on motion of the defendant.

improperly used corporate funds toward the purchase of a yacht and denied LL Lifestyle

the use of the vessel.  The debtor counters that his yacht purchase was consistent with a

compromise proposed by the plaintiff, and was done with the plaintiff's consent.

Moreover, Mr. Vidal contends that the plaintiff's lack of access to the vessel arose

because it proposed leasing terms the debtor found to be unacceptable.

Evidence was offered over a multi-day period[2] and the parties have

submitted post-trial memoranda.  This proceeding is now ripe for final determination.

I.

After consideration of the evidence presented and the parties' post-trial

submissions, I find that the following material facts were proven.

1. LL Lifestyle was a business organized as a C corporation under the laws

of the state of New York in January 2006, with its principal place of business in New

York, New York.  1 N.T. at 32-33; 2 N.T. at 109.

2. LL Lifestyle was intended to operate as a luxury vehicle club, whereby

individuals and corporations would pay a yearly membership fee for the right to use the

company's luxury yachts and automobiles and to "participate in the lifestyle that those

assets bring along."  1 N.T. at 7; 2 N.T. at 7.  As explained by one of its former officers:

> It was a membership based club, and people would buy
> membership, just like you would buy membership to a gym or
> a vacation club; they were very big at that time.  It was built
> on, I think, the vacation club model.  So you had one yacht or

---

[2]Evidence was presented during three days.  References to the three transcripts
will be denoted "1 N.T. at," "2 N.T. at" and "3 N.T. at."

> boat or car, and the idea was that you would put so many
> members per vehicle.  And at some point, the vehicle would
> pay for itself and produce profit.  So that's what—so those
> members were buying membership to the club, and in return,
> they were allowed to use the vehicles.

1 N.T. at 101; see also ex. D-3 at 46 (LL Lifestyle intended to use a business model

similar to NetJets).

3. LL Lifestyle had two classes of stock: voting common stock and

non-voting Series A preferred stock.  Exhibit D-3 at 54 (Private Placement

Memorandum).

4. The company authorized 10,000,000 shares of common stock and issued

5,350,000 of those shares by October 2006 (the date indicated on the private placement

memorandum describing such securities).  Holders of common stock were entitled to

vote, with a voting majority necessary for corporate decisions.  Common stock holders

could also receive dividends, as determined by the board of directors.  Exhibit D-3 at 54.

5. LL Lifestyle authorized 4,000,000 shares of Series A preferred stock and

issued 85,000 of those shares by October 2006.  Holders of Series A preferred stock were

not entitled to vote on general corporate matters, but were entitled to vote on certain

matters as required "by law or pursuant to the Certificate of Designation."  Series A

preferred stock holders were entitled to receive a 5% cash dividend annually, payable

quarterly in arrears.  Exhibit D-3 at 54-55.

6. At the time of the company's incorporation, Mr. Donald Choi was the

chief executive officer and the owner of the largest equity interest in the company, 1 N.T.

at 43, 70; 2 N.T. at 83, Mr. Jonathan Lapin was chief operating officer, 1 N.T. at 19, and

Mr. Lance Fieldman was corporate president, 1 N.T. at 68-69.

7. Company directors were chosen by a vote of common stockholders, with each board vacancy requiring a majority vote.  2 N.T. at 113.  Thereafter, corporate decisions were to be made by the board of directors, with each decision requiring the affirmative vote of at least seventy-five percent of the board.  2 N.T. at 56.

8. Four of the company's initial investors—Mr. Choi, Mr. Lapin, Mr. Fieldman and Michael Sison—held approximately sixty percent (60%) of the company's stock and, thus, could constitute the majority of common stockholders required to approve director appointments and other corporate decisions.  2 N.T. at 113.

9. LL Lifestyle's board of directors initially had four members: Mr. Choi, Mr. Lapin, Mr. Fieldman and Mr. Sison.  2 N.T. at 13 and 109.  Mr. Sison was removed from the board soon after his appointment.  Id.

10. To the extent that LL Lifestyle held formal director meetings, Mr. Lapin acted as though he was corporate secretary and prepared and transmitted minutes via email.  1 N.T. at 35-36; exs. LL-14, 15, 16.

11. During the corporation's existence, its officers were not paid salaries.  1 N.T. at 35, 106.

12. From its inception until early 2007, the company did not follow normal corporate formalities:

> Well, the company wasn't really – initially when we first formed it in 2006 [we] didn't really have any formal Board meetings.  This was something that was not to, you know, we're focused on the business, you know.  So, we weren't following or doing what, I guess, they're saying we were supposed to do.  When Roberto Vidal came aboard and he said, "Oh, you guys gotta make sure your corporate covenants are together.  You gotta do this.  You gotta do that."  So, we had our very first Board Meeting on February 12th, [2007,] when the letter of agreement was signed.

4

2 N.T. at 17 (testimony of Mr. Choi).

        13.  LL Lifestyle ceased operations by the latter part of 2007.  1 N.T. 27-28;

2 N.T. at 67.  LL Lifestyle was dissolved by the state of New York in 2011.  2 N.T. at 67.[3]

        14.  While it operated, LL Lifestyle offered several types of membership,

with initial and annual fees depending upon the type of membership purchased.  1 N.T. at

101-103; exs. D-3 (Private Placement Memorandum); D-11 (Executive Summary).

Among the membership options was a "founding" or "lifetime" membership for a

$100,000 fee.  2 N.T. at 11.

        15.  In addition to different types of memberships, LL Lifestyle also offered

"concierge" services to its members for an additional cost.  2 N.T. at 8-9 (testimony of

Mr. Choi regarding membership, stating: "I was heavily involved in the New York night

life and things like that, so I knew everybody at most of the restaurants, the clubs, etcetera

and it was a lifestyle most people can't attain or get access to without . . . knowing me.

---

[3] "A dissolved corporation, its directors, officers and shareholders may continue to function for the purpose of winding up the affairs of the corporation in the same manner as if the dissolution had not taken place. . . ." N.Y. Bus. Corp. Law § 1006.  Specifically, "[t]he corporation may sue or be sued in all courts and participate in actions and proceedings . . . in its corporate name, and process may be served by or upon it." Id., § 1006(a)(4).  "The dissolution of a corporation shall not affect any remedy available to or against such corporation, its directors, officers or shareholders for any right or claim existing or any liability incurred before such dissolution, except as provided in section 1007." Id., § 1006(b).  (Section 1007 addresses a procedure for the assertion of claims against a dissolved corporation.)

        Thus, this adversary proceeding, intended to assist LL Lifestyle in the collection and distribution of its assets, i.e., its disputed claim against Mr. Vidal, falls within the scope of N.Y. Bus. Corp. Law. § 1006.  See, e.g., School of Music of Brooklyn Free Musical Society v. Morrit, 145 N.Y.S.2d 645, 646-47 (N.Y. Sup. 1955) ("[I]t is the public policy of the state [of New York] to permit a corporation, even after dissolution, properly to wind up its affairs.  To do so it must collect and distribute outstanding assets."); see also Race Safe Systems, Inc. v. Indy Racing League, 251 F. Supp. 2d 1106 (N.D.N.Y. 2003) (applying New York law and holding that a dissolved corporation could maintain a patent infringement action); In re Artura, 230 B.R. 236 (Bankr. E.D.N.Y. 1999) (dissolved New York corporation had the right to file a proof of claim in a bankruptcy case).

So I offer that as an additional service on top of the membership. . . .").  Providing such

services was, in the opinion of LL Lifestyle, one significant way in which it differed from

its competitors.  See ex. D-3 at 37.

16. In early 2007, LL Lifestyle had obtained approximately 10 individual

and corporate memberships.  1 N.T. at 70; 2 N.T. at 10-12.  Three of the memberships

purchased were "founding memberships," generating $300,000 in revenue.  The

remaining memberships produced approximately $200,000 in revenue.  2 N.T. at 10-12.

17.  At the time relevant to this dispute, LL Lifestyle offered its members

access to a Boston Whaler fishing boat, three Sea Ray powerboats, a 40 foot Atlantis

yacht, a Lamborghini sports car and a Volkswagen Phaeton.  1 N.T. at 7-9; 2 N.T. at 16;

Exhibit D-3 (Private Placement Memorandum) at 21.  LL Lifestyle, however,  did not

own any of the water craft or vehicles in its "fleet."  2 N.T. at 11-14; ex. D-101 at 18-19

(Mr. Choi's deposition).

18. Except for a Sea Ray powerboat purchased by Net Powerboats, an entity

controlled by Mr. Choi, 2 N.T. at 12, and the Volkswagen Phaeton, owned by Mr. Choi, 2

N.T. at 15, the other vessels and vehicles were obtained after LL Lifestyle was

incorporated and were titled in the name of, and financed by, individuals or groups of

individuals involved with LL Lifestyle.  2 N.T. at 12 (testimony of Mr. Choi that "The

boats had to be done individually because . . . the company LL Lifestyle was just too new,

had no credit history.  So they wouldn't give any loans to the business. . . . So we had to

put it towards the individuals, and then find a way to put those assets back into a shell

company that could hold and maintain the assets.").

19. Those individuals, such as Mr. Lapin, informally agreed to allow LL Lifestyle to utilize the vessels or vehicle; there were no written agreements granting LL Lifestyle access to those assets, 1. N.T. 27, 38-39.

20. LL Lifestyle typically funded the down payment and monthly financing payments, by making payments directly to the pertinent seller and financing institution. 1 N.T. at 7-9 (Testimony of Lapin: "Q. Okay. And for each of these assets that you just enumerated, how much did LL Lifestyle contribute? A. Well, they took care of the down payments and the usual payments."); 1 N.T. at 21-23, 39-42.

21. For example, Mr. Lapin was involved in the financing of four of LL Lifestyle's assets. He financed a Sea Ray powerboat in his own name. He and his sister financed the purchase of a Lamborghini and a 40-foot Atlantis yacht, and he and his father financed the purchase of a Boston Whaler fishing boat. 1 N.T. at 7-9; 2 N.T. at 14. (Mr. Lapin's father and sister may have received shares of LL Lifestyle stock. See 1 N.T. at 38-39.) Mr. Sison also financed the purchase of an asset for LL Lifestyle. 1 N.T. at 9; 2 N.T. at 14.

22. Although the individual was liable for financing payments on assets used by LL Lifestyle, it was expected that such payments would actually be made by LL Lifestyle from membership fees. 1 N.T. at 22-23, 39-42.

23. Mr. Vidal joined LL Lifestyle as a member during the spring of 2006, before he became an investor. 3 N.T. at 7-8. Initially, Mr. Vidal joined as an "associate" member, paying a $25,000 fee, but he later upgraded his membership status to become a "lifetime" member, for an additional $75,000. 1 N.T. at 22, 91, 150; 2 N.T. at 66.

24. Mr. Vidal has a bachelor of arts in economics from Harvard University. 1 N.T. at 110. He has worked in the financial industry for companies such as Lehman Brothers, JP Morgan, and Cloudview Capital Management. 1 N.T. at 111-112. At the time of trial in this proceeding, Mr. Vidal was an independent contractor doing consulting work for Citibank through Enfinex, LLC, a limited liability company formed by the debtor and his business partner, Mr. George Pastrana. 1 N.T. at 112-116.

25. In the summer and fall of 2006, Mr. Vidal and LL Lifestyle officers discussed the possibility of Mr. Vidal investing in LL Lifestyle. 1 N.T. at 91-92; 3 N.T. at 8 (testimony of Mr. Vidal that he was approached by Mr. Choi, Mr. Lapin, and Mr. Fieldman about making an investment in LL Lifestyle); 2 N.T. at 67-68 (testimony of Mr. Choi that Mr. Vidal heard the company was raising capital and inquired about participating).

26. In connection with his potential investment, Mr. Vidal was given a copy of LL Lifestyle's "Private Placement Memorandum," ex. D-3, which provided information about, inter alia, LL Lifestyle's financial status, corporate structure, business plan and marketing strategy. Id.; see also 1 N.T. at 18, 89; 2 N.T. at 67-68; 3 N.T. at 8.

27. The Private Placement Memorandum was drafted by Mr. Choi and others, and was submitted to the Securities and Exchange Commission by the company's president, Mr. Lance Fieldman. 1 N.T. at 90; 2 N.T. at 68.

28. Certain information provided in the Private Placement Memorandum was inaccurate. As Mr. Choi acknowledged: "Well it's basically just raising money saying 'Hey, if we do this, this is what we're potentially able to do.' It doesn't mean [it is] accurate [in] any way." 2 N.T. at 69.

30. Although the Private Placement Memorandum contained some

cautionary language, ex. D-3 at 8-12, as well as a statement that mentions its use of

"Assets without laying out the capital and credit traditionally required," id. at 46, the

Private Placement Memorandum also provided the following information:

> LL has a pre-money valuation of $8,905,500, which was
> determined by multiplying the number of available boat slips
> (15) by an average value of $200,000, or $3M, plus the $1.5M
> in Assets, current Membership value, projected sales,
> trademarks, and management team.

Id. at 46.

31. In addition to stating that LL Lifestyle owns assets then worth $1.5

million, the Private Placement Memorandum further stated:

> LL recently completed a "soft launch" which began in June
> 2006, in New York City and the Hamptons, where it quietly
> marketed Membership through friends and associates of the
> Company. . . .  During this trial LL purchased and managed 8
> Vehicles ($1.5M value . . .) and signed on and serviced 12
> Members. . . .

Ex. D-3 at 17; see also id. at 21 (listing 6 vessels as currently owned); at 24 (listing the

Lamborghini as currently owned).

32. These statements of assets purportedly owned by LL Lifestyle were not

true.  2 N.T. at 70 (testimony of Mr. Choi: "The title was issued under the person that

financed the boat so at the end, if technically, they were not owned by LL [Lifestyle].").

33. The Private Placement Memorandum also implied that new investor

funds would be used primarily to obtain new assets:

> It is expected that any proceeds received and accepted from
> this Offering will be utilized by LL primarily for the
> acquisition of our fleet of powerboats, yachts and exotic cars,
> and to a lesser extent, for working capital and general

corporate purposes.  See "Risk Factors," "Use of Proceeds"
and "Business."

Ex. D-3, at 7; <u>see</u> <u>also</u> <u>id.</u> at 15.

34. Mr. Vidal reviewed the Private Placement Memorandum and asked Mr. Choi, Mr. Lapin and Mr. Fieldman to clarify certain aspects and to provide supplemental financial statements.  3 N.T. at 9.  In response to Mr. Vidal's request for supplemental financial information, Mr. Choi provided Mr. Vidal with a copy of the company's Draft Executive Summary, its balance sheet, a profit and loss statement for 2006, a cash flow statement for 2006 and financial projections for 2006 through 2008.  Ex. D-11 (email with Executive Summary Draft Attached); 3 N.T. at 27-28 (testimony of Mr. Vidal acknowledging the receipt of the email and Executive Summary).

35. The draft Executive Summary sent to Mr. Vidal repeated the "soft launch" statement that the corporation "purchased and managed 8 Vehicles ($1.5M value. . .)" found in the Private Placement Memorandum.  Ex. D-11.

36. After reviewing the aforementioned materials provided to him, Mr. Vidal believed that LL Lifestyle owned various assets.  3 N.T. at 10.  Based upon the information provided to him, Mr. Vidal (along with Mr. George Pastrana) agreed to purchase shares of the corporation.  Id.  Mr. Vidal orally agreed to invest $400,000 in exchange for 800,000 shares of Series A preferred stock, and Mr. Pastrana agreed to invest $200,000 in exchange for 400,000 shares of Series A preferred stock.  1 N.T. at 117-121, 150; 2 N.T. at 72; 3 N.T. at 10.[4]

---

[4]A written stock purchase agreement was later signed, as will be discussed <u>infra</u>.

37. Before Messrs. Vidal and Pastrana transferred their investment to LL Lifestyle, the company's bank account had a balance of negative $165.52. Ex. L-9 (North Fork bank statements for November and December 2006).

38. Mr. Pastrana transferred his $200,000 investment to LL Lifestyle on November 14, 2006. Ex. L-9. After his deposit cleared, LL Lifestyle's bank account had a balance of $199,834.48. Id.

39. Mr. Vidal made his investment in two installments—the first in the amount of $250,000 made on November 27, 2006, and the second for $150,000 on December 15, 2006. Id. See also 2 N.T. at 109-110.[5]

40. With his investment and his membership fee, Mr. Vidal paid $500,000 to LL Lifestyle in 2006. 3 N.T. at 10.

41. Before Mr. Vidal's first investment installment was deposited on November 27, 2006, LL Lifestyle's bank account had a balance of $23,776.04. Ex. L-9. Thus, during the 13 day period between Mr. Pastrana's investment on November 14, 2006 and Mr. Vidal's first investment payment, LL Lifestyle paid $198,608.44 from its operating bank account. During this same period, additional deposits totaling $22,500 were made. Id.

42. After Mr. Vidal's first investment payment of $250,000 was deposited on November 27, 2006, LL Lifestyle's account balance was $273,776.04. In the 19 days

---

[5]Exhibit L-9 reveals that a deposit in the amount of $250,000 was made into LL Lifestyle's bank account on November 27, 2006, with the funds identified as paid by Norodin Investment Management. Another deposit in the amount of $150,000 was made into this same account on December 16, 2006, without any identification of the payor. For purposes of this proceeding, there is no dispute that Mr. Vidal was the source of these two deposits and was treated as the corporate investor. See 2 N.T. at 72.

between Mr. Vidal's first and second installments, debits to the account totaled

$251,482.82, including payments totaling $191,250 to a company called Marine Max

(which payment will be discussed below).  There were no other deposits made during that

period.  Ex. L-9.

43. Before Mr. Vidal's second investment installment was deposited on

December 15, 2006, LL Lifestyle's bank account had a balance of $22,293.22.  Ex. L-9.

After Mr. Vidal's second investment installment was deposited on December 15, 2006,

LL Lifestyle's bank account had a balance of $172,293.22.  Id.  Between December 15

and December 31, 2007, debits to the account totaled $91,941.17, and the closing balance

for December 2007 was $80,352.05.  Id.

44. Thus, during the period between Mr. Pastrana's investment on

November 14, 2006 and December 31, 2006, debits totaling $542,332.03 were made from

LL Lifestyle's operating account, while deposits other than the $600,000 investment at

issue in this case totaled only $22,500.  Ex. L-9.[6]

45. At the time Mr. Vidal became an investor in LL Lifestyle, the Board of

Directors consisted of Messrs. Choi, Lapin and Fieldman.  2 N.T. at 110.

46. At the time of their investments in LL Lifestyle, Messrs. Vidal and

Pastrana also orally agreed to help finance the purchase a 62-foot Azimut yacht for use by

LL Lifestyle in return for additional corporate stock.  3 N.T. at 10-11.  This type of yacht,

which would cost $1.7 million, 3 N.T. at 46; ex. L-3 at 1, had been mentioned in the

---

[6]Attached to LL Lifestyle's November and December 2006 bank statements from
North Fork Bank are small photocopies of checks, which photocopies are very difficult to read.
From my review, it does appear that some of the checks LL Lifestyle issued during this two
month period were made payable to Messrs. Lapin, Fieldman, Sison and Choi.  Payments to
these individuals is consistent with an email excerpt that is the second page of exhibit D-11.

Private Placement Memorandum as a vessel LL Lifestyle intended to provide to its

members.  Ex. D-3 at 21.

47. Mr. Vidal credibly testified that it was agreed that this 62-foot yacht

would be purchased by him and Mr. Pastrana, who were responsible for obtaining the

financing.  LL Lifestyle would be expected to provide the down payment for the vessel

and tender monthly financing payments.  See 3 N.T. at 45-47; see also ex. L-12.[7]

Although not then known to Mr. Vidal, this arrangement was consistent with other assets

used by LL Lifestyle.

48. The investment by Messrs. Vidal and Pastrana, along with their yacht

purchase understanding, were memorialized in a "Letter Agreement–Investment in LL

Lifestyle, Inc."  Ex. L-3.  This letter agreement was signed by Mr. Vidal on February 12,

2007, but was backdated to December 4, 2006.  2 N.T. at 72, 153.  Mr. Choi signed the

agreement on behalf of LL Lifestyle as it Chief Executive Officer; Mr. Pastrana never

signed the agreement.  Ex. L-3.

49. The letter agreement stated in pertinent part:

The Investment.  You have offered to invest an aggregate of
$600,000 in the Company in exchange for approximately
1,200,000 shares of Series A preferred stock, par value
$0.00001 (the "Series A Stock" or "Shares')), the purchase
price per Share to be $0.50.  Such shares shall be issued as
follows:

| Investor | Purchase Price | Shares to be Purchased |
|----------|----------------|------------------------|
| George Pastrana | $200,000 | 400,000 |
| Roberto Vidal | $400,000 | 800,000 |

---

[7]Exhibit L-12 includes email messages dated January 29, 2007 to and from Mr.
Choi and Ms. Shannon Aisquith of Newcoast Financial, wherein Mr. Choi states that the yacht to
be purchased "will be shared by Me, Roberto [Vidal], George [Pastrana] and Jonathan [Lapin]."

> Additionally, for services rendered in connection with the financing and purchase of an Azimut 62 Yacht valued at approximately $1.75 million, the Company has agreed to grant Mr. Vidal an additional 435,500 Shares and Mr. Pastrana an additional 214,500 Shares. The Parties hereby agree that, unless agreed to by the Series A Holders (as defined herein), the Company shall not issue any additional shares of Series A Stock to any other person.

Ex. L-3.

50. Mr. Vidal received his Series A preferred stock on February 12, 2007, when he signed a subscription agreement. See ex. L-7 (Subscription Agreement); 1 N.T. at 120. Mr. Pastrana did not sign a subscription agreement, ex. L-7, and testified that he never received his shares of LL Lifestyle stock, 2 N.T. at 204. As will be discussed, Messrs. Vidal and Pastrana never completed the purchase of the 62' Azimut yacht, and Mr. Vidal did not recall receiving any additional stock. 1 N.T. at 121-22.[8]

51. Throughout December 2006 and January 2007, Messrs. Vidal and Pastrana provided loan application information to Newcoast Financial Services, the financing broker of yacht dealer Marine Max, in order to finance the purchase of a 62-foot Azimut yacht. 1 N.T. at 126-127; 3 N.T at 11-12; see ex. L-11 (Loan Application).

52. At the direction of Mr. Choi—but not after a formal vote by its directors —LL Lifestyle placed a deposit of $191,250 on the 62-foot Azimut yacht in November

---

[8] I note that the parties differ on their interpretation of this letter agreement. Mr. Choi opined that Mr. Vidal forfeited all LL Lifestyle stock issued to him when he failed to obtain the 62' Azimut yacht. 2 N.T. at 103-04. Mr. Vidal believes that only the promised additional stock was at risk if he did not purchase that vessel. 1 N.T. at 120-22. During his pretrial deposition, Mr. Choi took a position consistent with that of Mr. Vidal. Ex. D-101 at 18. LL Lifestyle's counsel referred to Mr. Vidal's agreement during the trial as a "two-part investment" involving "additional stock" for the purchase of the 62' yacht. 1 N.T. at 120-22.

As a precise interpretation of all terms of the letter agreement is not needed to decide the non-dischargeability litigation before me, I need not resolve their differences on whether Mr. Vidal forfeited all of his stock in the plaintiff corporation.

and December 2006 with Marine Max.  1 N.T. 15, 24, 52-55, 146-147, 163; ex. L-9.  The deposit was made in three installments—the first on November 28, 2006 in the amount of $25,000, the second on December 1, 2006 in the amount of $150,000 and the third on December 11 in the amount of $16,250.  Ex. L-9.  All three installments were made after Mr. Vidal's initial investment payment of $250,000 was deposited into LL Lifestyle's bank account.

53. The source of funds for all or virtually all of the $191,250 deposited with Marine Max were the investments made by Messrs. Vidal and Mr. Pastrana.  1 N.T. at 60, 163; 2 N.T. at 75 (testimony of Mr. Choi that the deposit was largely derived from the investment of Messrs. Pastrana and Vidal); ex. L-9 (reflecting, as detailed above, that— at most—$22,500 of the deposit could have come from sources other than Vidal's and Pastrana's investments).

54. As LL Lifestyle had paid the deposit to Marine Max from its account, communications from Marine Max and Newcoast Financial Services involving the yacht purchase were made to Mr. Choi, who would relay relevant information or queries to Mr. Vidal.  2 N.T. at 93; 3 N.T. at 12; exs. D-12, 13 (email messages from Choi to Vidal).

55.  At some point in January 2007, Mr. Vidal discovered that LL Lifestyle did not own the assets that it purported to own but, rather, those assets had been purchased by individual investors and were so titled.  3 N.T. at 13, 42-43.  In addition, around that time, Mr. Fieldman—the only director who had not invested in or financed an asset acquisition for LL Lifestyle, see 1 N.T. at 68; 2 N.T. at 68-69—communicated with Mr. Vidal about financial problems facing the corporation.  Specifically, Mr. Fieldman informed Mr. Vidal that LL Lifestyle had spent almost the entire $600,000 investment,

and had at that time only approximately $30,000 in its bank account. 1 N.T. at 94-95; 3 N.T. at 12-14, 38-39; ex. L-1 at 22-23.  Based upon this information, Mr. Vidal sought additional financial records from the corporation.  1 N.T. at 133; 3 N.T. at 38-39.

56.  Initially, upon learning that his investment had been spent and that LL Lifestyle did not own assets and had little cash, Mr. Vidal intended to "resurrect" LL Lifestyle.  1 N.T. at 95-96.  Thus, he signed the letter and stock subscription agreements on February 12, 2007.  3 N.T. at 14.  Shortly after signing those agreements, however, Mr. Vidal requested that LL Lifestyle return his investment.  2 N.T. 74-75, 76; 3 N.T. at 15-16; see also 1 N.T. at 133.

57. On February 12, 2007, LL Lifestyle held its first formal meeting of its board of directors.  2 N.T. at 111-12.  At or around the time of that meeting, Mr. Choi verbally resigned as corporate officer and director under pressure from other shareholders/directors who were dissatisfied with his corporate management decisions.  1 N.T. at 42-43; ex. L-14 (Board Minutes dated February 25, 2007) ("Donald gave a verbal resignation from the company that was accepted on 2/16/07").  At that meeting "Roberto had asked that his wife (Alyssa) represent him on the Board.  This was accepted."  Ex. L-14.

58.  On or about February 16, 2007, the date that Mr. Choi's resignation was accepted, Mr. Vidal demanded the return of his investment in LL Lifestyle.  1 N.T. at 133; 2 N.T. at 74-76, 118; 3 N.T. at 15-16.  Mr. Choi was aware of this demand.  2 N.T. 74-76, 118.

59. After his resignation but before the next board meeting on February 22, 2007, Mr. Choi called Mr. Vidal and offered to help him recoup at least a portion of his

investment in exchange for Mr. Vidal's assistance in restoring Mr. Choi's position on the board of directors.  Mr. Lapin was present with Mr. Choi during this call.  3 N.T. at 15-18.

60. A second formal board of directors meeting took place on February 22, 2007.  Ex. L-14.  At that meeting, and with the support of Mr. Vidal, Mr. Choi was voted back as a director of LL Lifestyle.  Id.; 2 N.T. at 80; 3 N.T. at 17. In addition, Mrs. Vidal was removed as a director and Mr. Vidal officially became a corporate director.  Ex. L-14; 1 N.T. at 73-74, 124.

61. At the February 22nd directors meeting, Mr. Vidal "expressed his intention not to complete the financing for the 62' Azimut."  Ex. L-14 at 2.  The directors also agreed to dissolve LL Lifestyle and create a new entity (using "LL" as part of its name), subject to the vote of the corporate shareholders.  Id.  There was no evidence presented that LL Lifestyle shareholders ever voted on that issue.

62.  Believing that the source of funds for LL Lifestyle's Marine Max deposit was his earlier investment, and seeking a return of those funds, on February 28, 2007, Mr. Vidal sent an email message to Mr. Choi, which stated: "Any news on my money at Marine Max?" Ex. D-12.  Mr. Choi replied that same day via email to Mr. Vidal, with a copy sent to Mr. Lapin, that Marine Max was refusing to return the $192,000 deposit, and relayed Marine Max's reasons for so refusing.

63.  In that same February 28, 2007 email, Mr. Choi listed three potential options available to LL Lifestyle as concerned the Marine Max deposit:

> Option 1: Trade in 42' Atlantis– we take a 15% hit from
> $540K and buy 43' flybridge for $650-$675K
> Refinance up to 80% or pay down only $120-$130k and then
> we can pull out $60K+ in cash

> Option 2: Just buy 43' [Azimut] Flybridge and finance 80%.
>
> Option 3: Lawsuit [against Marine Max] - but it would have to come from both Net Powerboats and LL Lifestyle, not from you because Cash did not come from you and you did not sign contract.  This would seriously hurt any relations we have with Surf Side 3 and business is totally dead.

Ex. D-12.

64. In a separate email sent on February 28, 2007 only two minutes after the above-quoted his email, Mr. Choi (without copying Mr. Lapin) proffered a fourth option to Mr. Vidal:

> Option 4: Go through with purchase and then immediately put yacht for private sale and recoup as much as you can.

Ex. D-12.  Mr. Choi acknowledged that his "option 4" proposed that Mr. Vidal purchase a yacht from Marine Max, as had been intended, and then immediately sell the yacht, with Mr. Vidal retaining the net proceeds of sale.  2 N.T. at 78 ("Q. So you were telling Mr. Vidal [with option 4] to sell the yacht and get his money back.  A. Yes."); 2 N.T. at 76:

> Q. Did you ever suggest to Mr. Vidal that in satisfaction of his claims to get his money back, that what he, and frankly what he and Mr. Pastrana should do would be take the deposit made on the 62-foot yacht and instead buy a 43-foot yacht and then resell that 43-foot yacht and keep the proceeds in satisfaction of the claim in exchange for their stock interest.
>
> A. I did as [sic] just as a shareholder and not as a Board director or CEO.  I was not an officer or board of the company.[9]  Correct.

65. Before the February 28, 2007 emails from Mr. Choi, Mr. Vidal credibly testified that he had discussed with the other directors his belief that:

---

[9]Mr. Choi had been restored as a director on February 22, 2007, before sending his "option 4" proposal on February 28, 2007.

> [T]here had been a lot of misappropriation of funds and that I
> would wind up suing them.  So that — you know, they had to
> figure something out.  I was threatening to go the [sic] SEC,
> the State Attorney and I had a claim against the company and
> I had a six — well, between George [Pastrana] and I, we had
> a $600,000 claim.

3 N.T. at 19.

66.  Mr. Vidal understood that his acceptance of proposed option 4 would constitute a compromise of any potential claims he had against the corporation or individuals associated therewith.  He (and Mr. Pastrana) would have use of the $192,000 deposit placed with Marine Max by LL Lifestyle from funds primarily derived from their 2006 investment.  They would own the yacht and would be financially responsible for all financing and expenses associated therewith.  LL Lifestyle would not be tendering monthly financing payments.  They would also forfeit the additional stock shares mentioned in the letter agreement.  Furthermore, they were relinquishing claims for the balance of their $600,000 investment.  3 N.T. at 19, 21-22, 24-25.

67.  In early March 2007, Mr. Fieldman, who was dissatisfied with corporate management decisions of Mr. Choi, 1 N.T. at 70-71, resigned as an officer of LL Lifestyle and was removed as one of its directors.  Ex. LL-15; 1 N.T. at 74.

68.  On March 14, 2007, Mr. Choi sent Mr. Vidal another email with the subject line: "Marine Max Deposit."  This email stated:

> I know your schedule is filled, but I hope you can find the
> time to discuss the status of the funds (deposit) with Marine
> Max for the 62' Azimut.  At this point, they will not return the
> deposit.  The view from Marine Max is:
>
> *After the second deposit [installment of $150,000], the intent
> to purchase was completed
> * You were approved for financing
> * Waited too long to consider a cancellation of the deal

19

* The boat was on hold for over three (3) months at their expense
* They are more than willing to go to court and have all their expenses covered based on the sales agreement that was signed.

Our goal is to support you and find the best possible scenario to return as much of this deposit back to you while salvaging our relationship with Marine Max. The longer we wait, the less willing they will be to negotiate with us. This may be the only option:

1. Put your name on a smaller luxury yacht (e.g. 43' Azimut flybridge)
2. Utilize the funds on deposit for downpayment [sic]
3. You will need to finance the yacht
4. Immediately have Marine Max turn around and sell the boat without putting it into the water
5. Once the yacht is sold and difference returned from all expenses, we can then prorate the shares accordingly.
6. This will salvage and restrengthen our relationship with Marine Max

This way we can get a majority of your money out. The alternative is to go to court, spend a lot of money to the lawyers and then have a real chance/possibility of losing the deposit as well.

Ultimately, if we don't put a plan together soon, they will keep all of it.

Ex. D-13. Thus, Mr. Choi was proposing a detailed method by which Mr. Vidal (and Mr. Pastrana) could obtain the benefit of LL Lifestyle's Marine Max deposit by purchasing a smaller yacht and then selling that yacht. 2 N.T. at 94.

69. Mr. Vidal credibly testified that he accepted "option 4" proposed on February 28, as detailed further in Mr. Choi's March 14, 2007 email, including his suggestion to purchase a smaller yacht. 3 N.T. at 20, 52-53.

70. At least some, if not all, of Mr. Choi's March 14th proposal to Mr. Vidal was communicated to Mr. Lapin, the only other director at the time. Mr. Lapin's

minutes of the final board of director's meeting held on March 21, 2007, which identify

only Messrs. Lapin, Choi and Vidal as attendees via phone conference, stated in part:

> The Board of Directors reinstated Donald Choi to CEO of LL
> Lifestyle. . . .
>
> D. Choi will work with Marine Max in an attempt to
> renegotiate the previous deal to return the down payment.
> Potentially purchase smaller boat and put it back for sale
> without placing it in the water.

Ex. L-16.  Based upon these minutes, I find that Mr. Vidal credibly testified that the

substance of Mr. Choi's option 4 proposal was communicated at that director's telephone

meeting, along with his acceptance of that proposal.  3 N.T. at 52-54.

71.  Mr. Vidal and Mr. Pastrana, on behalf of an entity formed by them

called VP Maritime LLC, executed an undated sales agreement with Marine Max for the

purchase of a 43' Azimut yacht.  The agreement stated in part:

> Buyer agrees to close on boat no later than March 30, 2007.
> This purchase agreement cancels and replaces previous
> purchase agreement for 2007 Azimut 62 Stock #40809.
> Deposits received to date totaling $191,250.00 to be
> transferred to this final agreement.

Furthermore, the purchase price for the 43' yacht was listed at $728,765, with a credit of

$191,250 on deposit, leaving a balance of $537,515 owing at the closing.  Ex. L-6.

72.  As it was agreed by the LL Lifestyle three directors in mid-March 2007

that Mr. Choi would negotiate with Marine Max regarding the deposit and yacht

purchase, and as Marine Max had previously dealt with Mr. Choi on behalf of LL

Lifestyle, from whom it had received the yacht deposit, concerning the return of its

deposit, see exs. D-12 and D-13, I conclude that Mr. Choi communicated LL Lifestyle's

consent to Marine Max, probably in March 2007—given the closing deadline of March

21

30th—permitting LL Lifestyle's deposit to be used by VP Maritime toward the purchase of a yacht.  See ex. L-6.  It is highly unlikely that Marine Max would have taken such direction from either Mr. Vidal or Mr. Pastrana.  Therefore, Mr. Choi's testimony that Mr. Vidal spoke to Marine Max and arranged for the transfer of the deposit, 2 N.T. at 39-40, is not credible.  In addition, I also conclude that Mr. Choi persuaded Marine Max to cancel the proposed sale of the 62' yacht and replace it with a 43' yacht.[10]

73.  Mr. Choi's testimony—that he knew that Mr. Vidal had formed VP Maritime, that VP Maritime was to own the 43' yacht, but that "VP Maritime was supposed to be a new corporation under LL Lifestyle to manage and own an assets of a

---

[10]These conclusions are also consistent with the testimony of Mr. Vidal:

A. I told them that I basically wanted, you know, my money back and that I would accept the option, that I would take the risk of financing, you know, this boat in order to recoup the losses.
Q. And did anyone comment on your remarks?
A. I think everyone just nodded in agreement or-said yes.
                              ***
Q. Tell me what [Mr. Choi] said at the meeting.
A. — he would get more information from MarineMax as to how to proceed.
Q. That was his comment. You remember that.
A. Yes, I do; because he continued to negotiate with them.
Q. What was he negotiating on your behalf with MarineMax for?
 A. That they would actually fulfill that option.
                              ***
Q. And what was Mr. Choi then — if the [43'] boat was chosen, and if your acceptance was chosen, what was left for Mr. Choi to negotiate? Do you recall?
A. He had to give approval to Marine Max that that deposit could be used by me.  So he was, effectively, in control of the board at the time.

3 N.T. at 53-54.
        Whether Mr. Vidal's belief is accurate—that Mr. Choi had actual authority to act on behalf of LL Lifestyle in negotiations with Marine Max regarding transfer of the deposit to VP Maritime—need not be determined in order to resolve this adversary proceeding.

43-foot Azimut yacht," 2 N.T. at 34—was not credible.  Such testimony is inconsistent

with his own proposal that Messrs. Vidal and Pastrana would own the yacht and quickly

sell it to recoup some of their investment.  Moreover, it is also inconsistent with the

manner in which other assets used by LL Lifestyle were titled.

74. On June 18, 2007, VP Maritime purchased a 43-foot Azimut yacht from

Marine Max.  3 N.T. at 56; ex. D-10.  To finance this purchase, VP Maritime and Messrs.

Vidal and Pastrana signed a "First Preferred Ship Mortgage" in the amount of $537,515,

in favor of SunTrust.  Ex. D-10.

75. In addition to Messrs. Vidal and Pastrana, Messrs. Choi and Lapin were

informed of the June 18th closing date and were present for at least a portion of the

closing.  3 N.T. at 55-56; ex. D-101 at 57.

76. After VP Maritime purchased the 43' Azimut yacht, Mr. Vidal and Mr.

Pastrana listed the yacht for sale with a boat broker in Connecticut.  3 N.T. at 56.  The

vessel did not sell.  3 N.T. at 29.  They did not list the yacht for sale with Marine Max

because Marine Max "couldn't guarantee a sale," and Mr. Vidal feared that the yacht

would simply sit idly in a showroom while financing payments accrued.  1 N.T. at 170.

77. While Mr. Vidal was trying to sell the yacht, he was also negotiating a

yacht lease with LL Lifestyle, which may then have been using the name "LL Yachts."  3

N.T. at 58.[11]  He viewed leasing the boat as a method to pay for the monthly ship's

mortgage payment.  Id.

---

[11]The minutes from the March 21, 2007 board meeting state: "To concentrate on the 'boat' side of the business, the company will start doing business as LL Yacht club."  Ex. L-16.

78. Mr. Choi and others connected with LL Lifestyle initiated lease discussions shortly after VP Maritime purchased the 43' yacht.  3 N.T. at 56-57.

79. While recognizing that VP Maritime's yacht's value would depreciate if placed in the water, Mr. Vidal decided to have the boat delivered to a New York City pier, rather than pay fees to Marine Max for showroom storage.  3 N.T. at 61.  Marine Max agreed not to charge VP Maritime any dockage fee for the period July 2007 through October 31, 2007 (referred to as the "2007 season").  Ex. L-5A.

80. Shortly after the yacht sale to VP Maritime, Mr. Lapin was assisting Mr. Vidal in communicating with Marine Max about bringing the boat to New York City.  Ex. L-8.

81. As of late June 2007, Mr. Vidal expressed his hope that a leasing arrangement with LL Lifestyle, acting under the name LL Yachts, would occur.  Id. (email from Vidal to Lapin: ". . . I look forward to our continued partnership in this and can't wait to see the newest addition to LL Yachts"); 1 N.T. at 162-63.

82. While the VP Maritime yacht was docked in New York City, Mr. Vidal permitted the use of the boat by LL Lifestyle to solicit more members, and as a place to hold lease negotiations.  2 N.T. at 50; 3 N.T. at 58; Ex. L-5.

83. By July 18, 2007, no lease had been agreed upon and Mr. Choi was informed that access to the VP Maritime yacht would be denied until a written lease agreement was reached.  Ex. L-4A.[12]

---

[12]Mr. Irwin Menken, who informed Mr. Choi that he and LL Lifestyle would have no boat access pending agreement of a written lease, was acting as agent for Mr. Vidal and VP Maritime.  See ex. L-5.

84.  No written lease agreement was ever reached, 3 N.T. at 30, and after July 2007 LL Lifestyle had no access to or use of the 43' yacht.  2 N.T. at 43, 48; 3 N.T. at 29-30.[13]

85. Mr. Choi testified that LL Lifestyle spent "money and effort" in using the 43' yacht to obtain new members, and was therefore harmed by Mr. Vidal's refusal to allow it access to VP Maritime's yacht.  2 N.T. at 51, 52.[14]  As Mr. Choi and other LL Lifestyle directors had anticipated that the yacht would be put up for sale immediately upon its purchase by Mr. Vidal, it is highly unlikely that any promotional efforts using the 43' yacht would have occurred before VP Maritime purchased the vessel in June 2007 and had it delivered to New York City.  Thus, I find that such efforts took place while lease negotiations were ongoing.

86. Since its yacht purchase, VP Maritime, and ultimately Messrs. Vidal and/or Pastrana have been liable for monthly payments on the ship's mortgage, which

---

[13]The parties dispute whether $4,164.12 paid to VP Maritime after the yacht was purchased was a lease payment or a good faith deposit as part of negotiations.  2 N.T. at 43-47; 3 N.T. at 29-31, 49-50.  VP Maritime ultimately returned those funds to Mr. Lapin.  Ex. D-15.

[14]But see 2 N.T. at 52 (Testimony of Donald Choi) partially contradicting his testimony about the harm allegedly caused:

> A. So, you know, we had clients that wanted to join the membership.  We actually had one that signed.  Lighthouse, but then it was embarrassing because they had all their customers and we couldn't deliver the boat to a paid, contract-signed customer, the 43-foot yacht.
>
> Q. Okay.
>
> A. So we worked out a better deal for the 42-Atlantis for them.

payments are about $4,140 monthly.  3 N.T. at 49.  The evidence suggests that beginning

in 2008 VP Maritime has been able to cover its monthly yacht expenses by rental to other

individuals or entities.  3 N.T. at 58.  Mr. Vidal testified:

> Q. Now, was it your intention to form VP Maritime to
> compete with LL Lifestyle's business?
> A. No.
> Q. Was it your intention to essentially, in conjunction with–
> strike that. Was it your intention to make VP Maritime a
> profitable yacht-sharing business?
> A. VP Maritime is not a yacht-sharing business.
> Q. Was it your intention to make VP Maritime a profitable
> business in terms of leasing yachts and so forth?
> A. My intention was to actually sell the yacht.  My intention
> has always been to try to sell the yacht, and the leasing
> agreement that I have just covers the cost so that I don't – or,
> well, it's not me anymore, so that Mr. Pastrana does not have
> any more liability.

87.  Given that other entities make yachts available for rentals, see ex. D-3

at 37, and given that LL Lifestyle's financial difficulties caused its directors in March

2007 to conclude that a corporate restructuring was necessary, see L-14, the availability

of VP Maritime's boat as a potential rental (as opposed to its sale) would not be the cause

of its cessation of operations in the latter part of 2007.

88. In April 2008, LL Lifestyle commenced a civil action against Messrs.

Vidal and Pastrana and VP Maritime in New York state court.  Ex. L-4.  That lawsuit was

still pending at the time Mr. Vidal filed his chapter 7 bankruptcy petition on May 18,

2010.  LL Lifestyle has asserted breach of contract and breach of fiduciary duty claims

against Mr. Vidal.  Ex. L-4.

89. After the lawsuit commenced, Mr. Vidal submitted a written resignation

as a director of LL Lifestyle.  1 N.T. at 124.

90. The chapter 7 trustee filed a report that, after the meeting of creditors and examination of the debtor under sections 341, 343, he concluded that there are no non-exempt assets available for distribution to creditors.  Docket entry dated July 12, 2010.  Thus, creditors were not obligated to file any proofs of claim.  See Fed. R. Bankr. P. 2002(e).

91. The debtor disclosed on Bankruptcy Schedule D that SunTrust held a secured claim in the approximate amount of $502,000, secured by a 43' Azimut yacht worth about $446,000.  Apparently, the chapter 7 trustee agreed that Mr. Vidal's interest in VP Maritime had insufficient value to benefit his creditors, and that there was little or no equity in the VP Maritime yacht at the time of Mr. Vidal's bankruptcy filing.

92. LL Lifestyle timely commenced the instant adversary proceeding.


II.


I reach the following legal conclusions in this adversary proceeding.

1. This adversary proceeding seeking a determination that a debt owed to the plaintiff is nondischargeable pursuant to 11 U.S.C. § 523(a)(2), (a)(4), or (a)(6) is a core proceeding.  11 U.S.C. § 523(c)(1); 28 U.S.C. § 157(b)(2)(I); see In re Midstate Mortgage Investors, Inc., 105 Fed. Appx. 420, 422 (3d Cir. 2004) (non-precedential).

2. The plaintiff  must demonstrate by a preponderance of the evidence that it is entitled to relief under section 523(a).  See, e.g., Grogan v. Garner, 498 U.S. 279, 287-88 (1991); In re Cohn, 54 F.3d 1108, 1114 (3d Cir. 1995).

27

3. The plaintiff failed to prove that the defendant obtained money or property from it by false pretenses, false representation or actual fraud.

4. The plaintiff failed to prove that the defendant submitted to it a writing concerning his financial condition that induced the plaintiff to provide money or property to the debtor, or that such writing was materially false when provided, or upon which the plaintiff reasonably relief.

5. The plaintiff failed to proved that the defendant committed a fraud or defalcation while acting in a fiduciary capacity.

6. The plaintiff failed to prove that the defendant either embezzled or stole its property.

7. The plaintiff failed to prove that the defendant willfully and maliciously injured it or its property.

III.

As mentioned earlier, in its Second Amended Complaint LL Lifestyle raises three grounds that its state law claims against Mr. Vidal are nondischargeable: Count I asserts that LL Lifestyle's claim against the defendant is nondischargeable by virtue of 11 U.S.C. § 523(a)(2); Count II asserts that its claim against the defendant is nondischargeable by virtue of 11 U.S.C. § 523(a)(4); and Count III asserts that its claim against the defendant is nondischargeable by virtue of 11 U.S.C. § 523(a)(6).

As the bankruptcy trustee has determined that Mr. Vidal's chapter 7 bankruptcy case will not yield any non-exempt assets for distribution to creditors, there is

no need for this court to fix the amount of LL Lifestyle's damage claim, if any, against

Mr. Vidal.  Instead, I shall accept that LL Lifestyle is a creditor holding a (disputed)

prepetition state law claim for damages against Mr. Vidal,[15] and will decide only whether

such claim is nondischargeable.

    If nondischargeable, then LL Lifestyle will be able to liquidate its claim

against the debtor, now pending in New York state court, when the bankruptcy stay is

terminated upon the closing of this chapter 7 case.  See 11 U.S.C. § 362(c)(2)(A).  If,

however, the debt owed by Mr. Vidal is found to be dischargeable, then further litigation

in state court will be enjoined by 11 U.S.C. § 524(a)(2) against the debtor only.  The

discharge injunction would not apply to LL Lifestyle's claims against Mr. Pastrana or VP

Maritime.  11 U.S.C. § 524(e); see In re Combustion Engineering, Inc., 391 F.3d 190, 236

n. 48 (3d Cir. 2004); First Fidelity Bank v. McAteer, 985 F.2d 114, 118 (3d Cir. 1993).

    Before analyzing the specific nondischargeability claims raised against Mr.

Vidal, I note that a creditor, such as LL Lifestyle, seeking a determination that a debt is

nondischargeable under section 523(a) bears the burden of demonstrating

nondischargeability by a preponderance of the evidence.  See, e.g., Grogan v. Garner, 498

U.S. 279, 291 (1991); In re Graham, 973 F.2d 1089, 1101 (3d Cir. 1992).  The burden is

placed upon the creditor because:

> The overriding purpose of the Bankruptcy Code is to relieve
> debtors from the weight of oppressive indebtedness and

---

[15]A creditor is one who holds even a disputed claim.  See 11 U.S.C. § 101(5), (10); In re Abijoe Realty Corp., 943 F.2d 121, 125 (1st Cir. 1991); In re Drexel Burnham Lambert Group Inc., 151 B.R. 674, 681 (Bankr. S.D.N.Y. 1993) (the term "creditor is broadly defined").  As mentioned in fact finding #88, at the time of the debtor's bankruptcy filing there was pending a state law civil action brought by LL Lifestyle against the debtor (and others).  In light of that pending lawsuit, the debtor properly scheduled LL Lifestyle as a creditor.

provide them with a fresh start. Exceptions to discharge are strictly construed against creditors and liberally construed in favor of debtors.

In re Cohn, 54 F.3d 1108, 1113 (3d Cir. 1995).

IV.

A.

In Count I of its complaint, LL Lifestyle asserts a claim under section 523(a)(2)(A), which provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

* * *

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing--

(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive[.]

In parsing the language of section 523(a)(2)(A), courts have drawn a distinction between a "false representation" and "false pretenses":

The "false representation" ground requires a showing that the
debtor made a "false or misleading statement about
something."  [In re Barnaby, 2007 WL 750332,] at *2
[(Bankr. D.N.J. 2007)].  The second option, "false pretenses,"
requires proof of an implied misrepresentation promoted
knowingly and willingly that creates a misleading
understanding of the transaction by the plaintiff.  Id. at *2
(citation omitted).  See [In re Ali, 321 B.R. 685,] at 690
[(Bankr. W.D. Pa. 2005)] (false pretense involves an implied
misrepresentation, as distinguished from an express
misrepresentation, that creates or fosters a false impression).

In re Giquinto, 388 B.R. 152, 165 n.26 (Bankr. E.D. Pa. 2008); see, e.g., In re Brandon,

297 B.R. 308, 313 (Bankr. S.D. Ga. 2002); Matter of Haining, 119 B.R. 460, 463-64

(Bankr. D. Del. 1990); In re Weinstein, 31 B.R. 804, 809 (Bankr. E.D.N.Y. 1983).

As observed by another bankruptcy court:

"False pretense do[es] not necessarily require overt
misrepresentations.  Instead, omissions or a failure to disclose
on the part of the debtor can constitute misrepresentations for
purposes of nondischargeability where circumstances of the
case are such that omissions or failure to disclose create a
false impression which is known by the debtor."  Peterson v.
Bozzano (In re Bozzano), 173 B.R. 990, 993 (Bankr.
M.D.N.C. 1994). . . .  Failure to disclose material facts on
which a transaction depends constitutes false pretenses within
the statute.

In re Soliz, 201 B.R. 363, 369 (Bankr. S.D.N.Y. 1996).

In order for a plaintiff to prevail under the false representation provision of

section 523(a)(2)(A) it must demonstrate that:

(1) the debtor made representations knowing they were false;
(2) the debtor made the representations with the intent and
purpose of deceiving the plaintiff; (3) the creditor justifiably
relied on the debtor's false representations; and (4) the
creditor suffered a loss or damage as a proximate
consequence of the representations having been made.

31

In re Adalian, 474 B.R. 150, 160 (Bankr. M.D. Pa. 2012); see, e.g., Field v. Mans, 516

U.S. 59, 61 (1995); In re Ophaug, 827 F.2d 340, 342 n. 1 (8th Cir. 1987); In re Maurer,

112 B.R. 710, 712-13 (Bankr. E.D. Pa. 1990).

The elements of establishing a nondischargeable claim for false pretenses

are similar:

> In order to establish that a debt is nondischargeable under §
> 523(a)(2)(A) as a debt for money, property, services, or credit
> obtained by false pretenses, a plaintiff must prove by a
> preponderance of the evidence that: "(1) the [defendant] made
> an omission or implied misrepresentation; (2) promoted
> knowingly and willingly by the defendant[ ]; (3) creating a
> contrived and misleading understanding of the transaction on
> the part of the plaintiff [ ]; (4) which wrongfully induced the
> plaintiff[ ] to advance money, property, or credit to the
> defendant."

In re Khafaga, 419 B.R. 539, 546 (Bankr. E.D.N.Y. 2009) (quoting In re Hambley, 329

B.R. 382, 396 (Bankr. E.D.N.Y. 2005)).

Therefore, whether asserting that false pretenses or a false representation

were made and warrant relief under section 523(a)(2)(A), a showing of fraudulent intent

to deceive is required.  See, e.g., In re Davis, 638 F.3d 549, 552 (7th Cir. 2011); In re

Sharp, 340 Fed. Appx. 899, 901 (4th Cir. 2009); Palmacci v. Umpierrez, 121 F.3d 781,

788 (1st Cir. 1997).  Moreover, when evaluating whether a debtor fraudulently deceived a

creditor by his misrepresentations or false pretenses, a court must look at the debtor's

intention, Field v. Mans, 516 U.S. at 59, at the time the misrepresentation, either express

or implied, was made.  See, e.g., In re Sherman, 658 F.3d 1009, 1014 (9th Cir. 2011);

Matter of Jadusingh, 2001 WL 360701, at *2 (E.D. Pa. 2001); In re Brady 243 B.R. 253,

259 (E.D. Pa. 2000).  Such intent may be established by circumstantial evidence.  See,

e.g., In re Adalian, 474 B.R. at 160; In re Giquinto, 388 B.R. at 166.

32

In other words, to warrant relief under section 523(a)(2)(A), the plaintiff must prove the debtor's fraudulent intent at the time the debt arose.  See Palmacci v. Umpierrez, 121 F.3d at 787 ("If, at the time he made his promise, the debtor did not intend to perform, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met).  If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made."); see also In re Dobek, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002) ("For purposes of Section 523(a)(2), however, the timing of the fraud and the elements to prove fraud focus on the time when the lender . . . made the extension of credit to the Debtor.").

Thus, a creditor's demonstration that a debtor committed a breach of a contract, by itself, would not render the contract claim nondischargeable:

> It is well established that "a broken promise to repay a debt, without more, will not sustain a cause of action under § 523(a)(2)(A)."  In re Harrison, 301 B.R. 849, 854 (Bankr. N.D. Ohio, 2003).  Were it otherwise, every breach of contract would give rise to a nondischargeability claim under § 523(a)(2)(A).

In re Singh, 433 B.R. 139, 163 (Bankr. E.D. Pa. 2010); see, e.g., In re Ricker, 2012 WL 2951383, at *9 (Bankr. E.D. Pa. 2012).  "Instead, central to the concept of fraud is the existence of scienter which, for purposes of § 523(a)(2)(A), requires that it be shown that at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation."  In re Harrison, 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003).

In support of its claim under section 523(a)(2)(A), LL Lifestyle asserts that Mr. Vidal implicitly or expressly agreed to finance the purchase of a 62' yacht on behalf

33

of the plaintiff or for use in the plaintiff's business, without any intention to do so.  In addition, LL Lifestyle contends that, after signing the agreement, Mr. Vidal promoted the false pretense that he would purchase this yacht for LL Lifestyle's use.  Moreover, he made the same misrepresentations and promoted the same false pretenses as to the 43' yacht that was ultimately purchased.  Furthermore, he misrepresented or promoted the false pretense that VP Maritime would be controlled by LL Lifestyle.

Finally, LL Lifestyle argues that it justifiably relied upon Mr. Vidal's express or implicit representations or false pretenses, as he was a member of its corporate board of directors, and LL Lifestyle provided him with almost $192,000 toward the purchase of the vessel.  LL Lifestyle further contends that these express or implicit representations were untrue when made, as Mr. Vidal formed a competing company and, acting for that competing company, purchased the yacht.  As a result, LL Lifestyle maintains that it suffered damages from the loss of its deposit funds, the loss of the use of the yacht, and the competition from the defendant's new company.

The evidence presented does not support the plaintiff's contention that the defendant intended any fraudulent representations and/or promoted false pretenses at the time of his investment in December 2006, nor when he signed the Letter Agreement in February 2007, nor at any time thereafter.  Moreover, LL Lifestyle failed to prove that Mr. Vidal intended any misrepresentations or false pretenses regarding the funds deposited with Marine Max, or the control of VP Maritime.[16]

---

[16]I need not address the other elements required under section 523(a)(2)(A).  For example, it is speculative at best that LL Lifestyle would have had sufficient funds in 2007 to pay the monthly financing charges, had Messrs. Vidal and Pastrana purchased the 62' yacht at a cost of $1.7 million.

Insofar as the investment portion of the agreement is concerned, the debtor invested $400,000 in December 2006, as promised, after previously paying $100,000 for a lifetime membership.  There is no dispute that LL Lifestyle received those funds, deposited them into its bank account and used these investment funds in its account in December 2006 without the knowledge or input of Mr. Vidal.

Insofar as the yacht purchase component is concerned, there is also no dispute that Mr. Vidal indeed submitted a loan application for a 62' yacht to be obtained from Marine Max and financed by Newcoast.  See In re Isaacson, 2012 WL 3637928, at *7 (Bankr. E.D. Va. 2012) (partial performance of a contract demonstrates an intent to perform when the contract was entered into).  Then, in February 2007, after he signed the Letter Agreement, after he was informed by the corporate president of adverse financial information about LL Lifestyle, after he learned that the corporation did not own the assets it was using, he informed LL Lifestyle's directors that he would not go forward with the purchase of the 62' yacht.  See ex. L-14 (minutes of February 22, 2007 directors meeting).  Thereafter, in agreement with a proposal made by Mr. Choi on March 14, 2007, ex. D-13, made while Mr. Choi was a corporate director and its largest shareholder (and soon to be restored as Chief Executive Officer), Mr. Vidal proceeded to purchase a smaller yacht, the 43' Azimut.  His intention to modify the original purchase agreement was also known to Mr. Lapin, the other director.  See ex. L-16; 3 N.T. at 52-54.

The evidence surrounding the $192,000 placed on deposit with Marine Max by LL Lifestyle reveals that this deposit was made without the prior knowledge of Mr. Vidal, and was derived completely, or almost completely, from the investments made by Messrs. Vidal and Pastrana.  Moreover, although Mr. Choi denies doing so, the evidence

strongly supports Mr. Vidal's testimony that Mr. Choi instructed Marine Max to transfer the 62' boat deposit to the use of VP Maritime for the latter's purchase of a 43' yacht.

For purposes of section 523(a)(2)(A), I need not decide whether the deposit was properly authorized by the LL Lifestyle directors in 2006, as consistent with its by-laws, or later ratified.  Moreover, I will accept, for purposes of section 523(a)(2)(A), without now deciding, that the actions taken by Mr. Vidal were in breach of his Letter Agreement with LL Lifestyle: Mr. Vidal promised to arrange financing of a 62' yacht for the use of the corporation, in return for additional preferred stock.  That is, in order to decide whether Mr. Vidal defrauded the corporation, I need not decide, as the debtor implies, that the yacht purchase agreement was legally rescinded or modified under New York law.

Instead, I am persuaded by the documentary evidence and the testimony presented that Mr. Vidal entered into his Letter Agreement to invest and purchase a yacht in good faith, with every intention of completing the transaction.  See In re Isaacson, 2012 WL 3637928, at *7.  Moreover, he sincerely believed that—in return for his not claiming that LL Lifestyle made misrepresentations in its Private Placement Agreement and Executive Summary, which might entitle him to recovery of damages from the corporation and its officers and directors—the corporation agreed to allow him and Mr. Pastrana to use the Marine Max deposit, which deposit was derived from their investment, for his own benefit (and that of Mr. Pastrana), and thus allow a partial recovery of the invested sums.  His switch to a smaller yacht was fully disclosed and not opposed; the purchase of the vessel by VP Maritime was known; the use of the LL

Lifestyle deposit was known.  His ability to sell the yacht after its purchase and retain the

net proceeds was known to the plaintiff and, he believed, proposed by the corporation.

   In other words, and without focusing on the other elements needed to prove

fraud, LL Lifestyle did not meet its burden of demonstrating that Mr. Vidal acted with the

requisite intent to defraud or mislead it regarding his investment in the corporation, the

use of the Marine Max deposit, the ultimate purchase of the 43' yacht by VP Maritime,

and the failure of VP Maritime to lease the vessel to LL Lifestyle.  Whether correct as a

matter of state law or not, the debtor believed he had the consent of LL Lifestyle to act as

he did.  Thus, his intent to defraud was unproven.  See generally, e.g., Lind Waldock &

Co. v. Morehead, 1 Fed. Appx. 104, 107-08 (4th Cir. 2001); In re Crawford, 2012 WL

3061517 (Bankr. W.D. Pa. 2012); In re Ricker, 2012 WL 2951383 (Bankr. E.D. Pa.

2012); In re Morris, 2011 WL 2693966 (Bankr. N.D. Tex. 2011).

   Accordingly, LL Lifestyle is not entitled to relief under section

523(a)(2)(A).


## B.


   Upon earlier consideration of the debtor/defendant's motion to dismiss the

plaintiff's second amended complaint, plaintiff's counsel conceded at oral argument that

it was not raising any claim under section 523(a)(2)(B).  See Statement of Reasons In

Support of Order denying Defendant's Motion to Dismiss the Second Amended

Complaint, at 6 n.2 (November 4, 2011), docket entry #179.  Despite that concession, the

plaintiff's post-trial submission asserts as follows:

> Mr. Vidal's signing of the Letter Agreement and Subscription
> agreement along with the financial information that he
> provided in support of his investment in Lifestyle's business
> constituted false representation or actual fraud regarding his
> financial condition.

Plaintiff's Proposed Conclusion of Law, #10.

If I assume that any claim under section 523(a)(2)(B) has not been waived

because the claim was tried without objection by the defendant, see Fed. R. Bank. P. 7015

(incorporating, inter alia Fed. R. Civ. P. 15(b)), I conclude that LL Lifestyle has not

proven that it is entitled to relief under this provision.

> Subsection (2)(B). . . was designed to bar the bankruptcy
> discharge of a debt obligation that was induced by a false
> written statement of the debtor's financial condition. . . . In
> order to satisfy subsection (2)(B), a creditor must prove five
> elements: (1) "use of a statement in writing," (2) "that [was]
> materially false," (3) "respecting the debtor's ... financial
> condition," (4) "on which the creditor ... reasonably relied,"
> and (5) "that the debtor caused to be made or published with
> intent to deceive." § 523(a)(2)(B).

In re Sharp, 340 Fed. Appx. 899, 901 (4th Cir. 2009).

First, the "Letter Agreement," ex. L-3, is not a written statement of Mr.

Vidal's financial condition.  See In re Bashor, 2011 WL 4595508, at *5-*6 (W.D.N.C.

2011); Czech v. Sieber, 2009 WL 4017971, at *3 (D. Md. 2009); see generally In re

Tallant 218 B.R. 58, 70 (B.A.P. 9th Cir. 1998) (written document must at least include a

statement of the debtor's financial condition).  This document detailed Mr. Vidal's

purchase of corporate stock, contained an agreement to buy a vessel in return for

additional stock, and contained provisions concerning dividends, issuance of future

shares, voting rights, stock transfer restrictions, use of the investor's name in marketing,

confidentiality requirements, expenses connected with this agreement and the need for

both parties to enter into a shareholder agreement.  Ex. L-3.

Second, the "Subscription Agreement," ex. L-7, dated February 12, 2006,[17]

contains a "Confidential Purchaser Questionnaire," in which the debtor's responses

concerning his annual income and estimated net worth may constitute a written statement

of financial condition.  See In re Tallant 218 B.R. at 70.  The plaintiff, however,

presented no evidence regarding its falsity when signed.  Nor, since Mr. Vidal had paid

his $400,000 investment in full two months before this document was signed, had paid

$100,000 to become a lifetime member, his investment and membership fee already had

been spent by the plaintiff, and the debtor had already applied for financing toward the

purchase of a yacht, was there any evidence of justifiable reliance on the information

provided in this agreement.  See In re Coughlin, 27 B.R. 632, 636-37 (B.A.P. 1st Cir.

1983):

> Courts generally agree that the creditor must show that it
> considered and relied on the actual financial statement in
> question. . . .  Courts have found that the reliance element of
> section 523(a)(2)(B) was missing when the evidence indicated
> that the creditor was relying solely on a previous loan
> repayment, . . .  the debtor's established credit rating, . . .  or
> on the pledged security, . . . or when the false financial
> information was submitted after the goods or services were
> provided. . . .

(citations omitted); see also Green Bay Packaging, Inc. v. Oscarson, 2007 WL 3407108,

at *4 (N.D. Ill. 2007);  Miles Employee Federal Credit Union v. Griffin, 22 B.R. 821,

824-25 (Bankr. S.D. Ohio 1982).

---

[17]The evidence demonstrated that this document was signed on February 12, 2007.

In addition, there was no evidence that the claims made by LL Lifestyle against Mr. Vidal—alleged misappropriation of the Marine Max deposit, and alleged failure to purchase a yacht for the plaintiff's use—were "induced" by or proximately caused by any misinformation provided on the stock subscription agreement signed by the debtor.  See generally In re Vermilio, 457 B.R. 863 (Bankr. M.D. Fla. 2011); In re Hyland, 2000 WL 1210822, at *4 (Bankr. E.D. Pa. 2000) (a claim under section 523(a)(2)(B) requires that "the creditor sustained the alleged loss and damages as a proximate result of the representation having been made.").

Therefore, to the extent that LL Lifestyle is asserting a claim under section 523(a)(2)(B), that claim was also unproven.

## V.

### A.

Count II raises a non-dischargeability claim under 11 U.S.C. § 523(a)(4). Under section 523(a)(4), a claim is nondischargeable when it is "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).

As noted by courts and commentators, "the term 'while acting in a fiduciary capacity' does not qualify the words 'embezzlement' or 'larceny.'  Therefore, any debt resulting from embezzlement or larceny falls within the exception of clause (4)."  5 Collier on Bankruptcy, ¶ 523.10[2] (16th ed. 2012) (footnote omitted).  The existence of a fiduciary relationship is not required for the non-dischargeability of a debt owing to

40

larceny or embezzlement.  <u>See</u>, <u>e.g.</u>, <u>In re Giarratano</u>, 299 B.R. 328, 337 (Bankr. D. Del. 2003).

For purposes of this subsection, a bankruptcy court should apply the federal common law definitions of larceny and embezzlement.  <u>See</u> <u>United States v. Patton</u>, 120 F.2d 73, 75 (3d Cir. 1941) ("It is . . . well settled that when a federal statute uses a term known to the common law to designate a common law offense and does not define that term, courts called upon to construe it should apply the common law meaning."); <u>see</u> <u>also</u> <u>In re Ormsby</u>, 591 F.3d 1199, 1205 (9th Cir. 2010); <u>In re Steele</u>, 2005 WL 281154, at *3 (Bankr. E.D. Pa. 2005); <u>In re Ardolino</u>, 298 B.R. 541, 545 (Bankr. W.D. Pa. 2003); <u>In re</u> <u>Booker</u>, 165 B.R. 164, 170 (Bankr. M.D.N.C. 1994).

Federal common law defines larceny as: "the taking and removing, by trespass, of personal property which the trespasser knows to belong either generally or specially to another, with the felonious intent to deprive him of his ownership therein." <u>United States v. Patton</u>, 120 F.2d at 75 (internal citation and quotations omitted); <u>see</u> <u>also</u> <u>In re Ormsby</u>, 591 F.3d at 1205 n.4 ("Felonious is defined as 'proceeding from an evil heart or purpose; malicious; villainous. . . . Wrongful; (of an act) done without excuse of color of right.'" (citing <u>In re Kiesewetter</u>, 391 B.R. 740, 748 (Bankr.W.D. Pa. 2008), which quoted <u>Black's Law Dictionary</u> (8th ed. 2004)); <u>Matter of Rose</u>, 934 F.2d 901, 903 (7th Cir. 1991) ("Larceny is proven for § 523(a)(4) purposes if the debtor has wrongfully and with fraudulent intent taken property from its owner."); <u>In re Barrett</u>, 156 B.R. 529, 533 n.3 (Bankr. N.D. Tex. 1993), <u>aff'd</u>, 1999 WL 184117 (N.D. Tex. 1999); 5 <u>Collier on</u> <u>Bankruptcy</u>, ¶ 523.10[2] (16th ed. 2012) ("Larceny is the fraudulent and wrongful taking

and carrying away of the property of another with intent to convert the property to the

taker's use without the consent of the owner.").

   "One of the essential elements of [larceny] is that the taking is by trespass,

that is, without the consent of the owner." United States v. Patton, 120 F.2d at 75. This

means that for the larceny exception to render a debt nondischargeable, a creditor must

demonstrate that the original taking of the property was unlawful. In re Giarratano, 299

B.R. at 338; Werner v. Hofmann, 5 F.3d 1170, 1172 (8th Cir. 1993) (per curiam); 5

Collier on Bankruptcy, ¶ 523.10[2] (16th ed. 2012).

   Federal common law provides the following elements for embezzlement:

"(1) appropriation of funds for the debtor's own benefit by fraudulent intent or deceit; (2)

the deposit of the resulting funds in an account accessible only to the debtor; and (3) the

disbursal or use of the funds without explanation of reason or purpose." In re Ardolino,

298 B.R. at 545-46 (citations and quotations omitted); see also In re Powers, 261 Fed.

Appx. 719, 723 (5th Cir. 2008); In re Wallace, 840 F.2d 762, 765 (10th Cir. 1988) ("For

purposes of establishing nondischargeability under section 523(a)(4), embezzlement is

defined under federal common law as 'the fraudulent appropriation of property by a

person to whom such property has been entrusted or into whose hands it has lawfully

come.'") (quoting In re Graziano, 35 B.R. 589, 594 (Bankr. E.D.N.Y. 1983)); In re

Hartman, 254 B.R. 669, 674 (Bankr. E.D. Pa. 2000); In re Booker, 165 B.R. at 170.

Embezzlement differs from larceny in that the original taking was lawful, and the debtor

subsequently misappropriated the property for his own use. In re Giarratano, 229 B.R. at

338; In re Hartman, 254 B.R. at 674; In re Kressner, 155 B.R. 68, 74 (Bankr. S.D.N.Y.

1993); 5 Collier on Bankruptcy, ¶ 523.10[2] (16th ed. 2012) ("Embezzlement is the

fraudulent appropriation of property by a person to whom such property has been

entrusted, or into whose hands it has lawfully come.").

As summarized, "section 523(a)(4) excepts from discharge debts resulting

from the fraudulent appropriation of another's property, whether the appropriation was

unlawful at the outset, and therefore a larceny, or whether the appropriation took place

unlawfully after the property was entrusted to the debtor's care, and therefore was an

embezzlement."  5 Collier on Bankruptcy, ¶ 523.10[2] (16th ed. 2012).

I do not understand LL Lifestyle to argue that Mr. Vidal either embezzled

or committed larceny insofar as the 43' Azimut yacht is concerned.  As set out above,

ownership of this yacht was intended to be, since March 2007, and always was since its

purchase, in the name of VP Maritime.  As with the other assets it used, the plaintiff did

not expect that it would have title to this yacht.  Moreover, I find that the either the

corporate plaintiff actually agreed (as will be discussed later), or at a minimum Mr. Vidal

reasonably believed it agreed, that he could sell the yacht and retain its net proceeds.  To

the extent that LL Lifestyle maintains that Mr. Vidal's failure to sell the yacht was a

breach of his agreement with it, "noncompliance with contractual terms" does not

constitute larceny or embezzlement.  5 Collier on Bankruptcy, ¶ 523.10[2] (16th ed.

2012).

Less clear is whether LL Lifestyle is asserting that Mr. Vidal embezzled the

Marine Max deposit the corporation made with that vendor in December 2006.  If so, this

assertion was unproven.  Rather, I find that LL Lifestyle either authorized, or Mr. Vidal

reasonably believed that it authorized, his (and Mr. Pastrana's) use of the deposit as part

of a compromise by which those two investors would possibly be able to recover a

portion of their corporate investments.  Indeed, I have found that Mr. Choi, either with

apparent or actual authority, directed Marine Max to apply the plaintiff's deposit to VP

Martime's purchase of the 43' yacht.  Accordingly, the Marine Max deposit was neither

embezzled nor obtained by larceny.  See Matter of Weber, 892 F.2d 534, 539-40 (7th Cir.

1989) (finding that no embezzlement under section 523(a)(4) is proven when the plaintiff

has given tacit consent to the debtor's use of property).


B.


More clearly, LL Lifestyle argues that the first prong of section 523(a)(4)

applies.  To prevail under this portion, a creditor must establish by a preponderance of

evidence that the debtor was in a fiduciary relationship with the creditor, and that the

debtor committed a fraud or defalcation while acting in his role as a fiduciary.  See, e.g.,

In re Schlessinger, 208 Fed. Appx. 131, 133 (3d Cir. 2006) (non-precedential); In re

Baylis, 313 F.3d 9, 17 (1st Cir. 2002); In re Siegfried, 5 Fed. Appx. 856, 859 (10th Cir.

2001); In re Roemmele, 2011 WL 4804833, at *4.  The fiduciary capacity contemplated

by section 523(a)(4) is somewhat narrowly defined:

It is understood that "[t]he concept of a fiduciary is narrower in a

bankruptcy context than it is under the common law.  One may qualify as a fiduciary

under the common law without so qualifying for purposes of [section] 523(a)(4)."  In re

Masdea, 307 B.R. 466, 472 (Bankr. W.D. Pa. 2004) (citations omitted); see, e.g., In re

Marques, 358 B.R. 188, 194 (Bankr. E.D. Pa. 2006).  Thus, although state law definitions

of fiduciary are relevant for purposes of section 523(a)(4), see, e.g., In re D'Abrosca,

2011 WL 4592338, at *5 (B.A.P. 1st Cir. 2011); In re Tyson 450 B.R. 514, 524 n.14

(Bankr. E.D. Pa. 2011); see generally In re Docteroff, 133 F.3d 210, 216-17 (3d Cir.

1997), the fact that a fiduciary relationship exists under state law does not necessitate

such a finding under section 523(a)(4).  See In re Karlin, 112 B.R. 319, 322 (B.A.P. 9th

Cir. 1990) ("While the debtor admitted that a fiduciary duty was owed to the appellant

through their doctor-patient relationship, this fact alone is insufficient to establish the

non-dischargeability of a debt under § 523(a)(4).  The Ninth Circuit has set forth the

recognized rule that the broad general definition of a fiduciary—a relationship involving

confidence, trust, and good faith—is inapplicable in the dischargeability context.")

(quotations omitted).

        More precisely, within bankruptcy jurisprudence the notion of a fiduciary

relationship has been limited to situations where an express or technical trust has been

established.  See, e.g., In re Marques, 358 B.R. at 194; In re Masdea, 307 B.R. at 472; In

re Scott, 294 B.R. 620, 630 (Bankr. W.D. Pa. 2003); In re Kaplan, 162 B.R. 684, 704

(Bankr. E.D. Pa. 1993) ("[T]o give rise to § 523(a)(4) liability, it is not sufficient for the

plaintiff to prove only that there was a fiduciary relationship between the parties, but also

to prove that there is an express trust held by the fiduciary (debtor) on behalf of the

beneficiary (creditor), which did not arise out of the action that created the fiduciary

relationship."), aff'd, 189 B.R. 882 (E.D. Pa. 1995); In re Shervin, 112 B.R. 724, 730-31

(Bankr. E.D. Pa. 1990).

        If LL Lifestyle can establish that Mr. Vidal was in a fiduciary relationship

with the corporation within the narrow scope of section 523(a)(4), it must also establish

that the debtor committed a fraud or defalcation while acting in that role.  "In the context

45

of § 523(a)(4), "fraud" involves "intentional deceit, rather than implied or constructive fraud.'" In re Tyson, 450 B.R. at 522 (quoting In re Youngblood, 2009 WL 1232103, at *10 (Bankr. S.D. Tex. 2009)).  "Defalcation includes any failure to account for funds that have been entrusted to the fiduciary." In re Womack, 305 B.R. 381 (table), 2004 WL 221759, at *2 (B.A.P. 10th Cir. 2004), aff'd, 122 Fed. Appx. 400 (10th Cir. 2005).  For purposes of section 523(a)(4), "defalcation" is limited to situations where a fiduciary misappropriates or otherwise fails to account for money or property held in her fiduciary capacity.  See, e.g., In re Briles, 2001 WL 873829, at *1 (9th Cir. 2001); 5 Collier on Bankruptcy, ¶ 523.10[1][b] (16th ed. 2012) ("'Defalcation' refers to a failure to produce funds entrusted to a fiduciary. . . .").  "Inherent in 'defalcation' is the requirement that there be a breach of fiduciary duty; if there is no breach, there is no defalcation." In re Baylis, 313 F.3d at 17.

As noted recently by the Eleventh Circuit Court of Appeals, courts are divided over the issue of scienter as a component of defalcation, an issue which the Third Circuit has not addressed:

> This Court recognizes that there is a split among the circuits regarding the meaning of defalcation under § 523(a)(4).  The Fourth, Eighth, and Ninth Circuits have concluded that even an innocent act by a fiduciary can be a defalcation.  See In re Uwimana, 274 F.3d 806, 811 (4th Cir. 2001) (stating that "even an innocent mistake which results in misappropriation or failure to account" can be a defalcation); In re Cochrane, 124 F.3d 978, 984 (8th Cir. 1997) (concluding that defalcation does not require intentional wrongdoing; stating that it includes a fiduciary's innocent failure to fully account for money received); In re Sherman, 658 F.3d 1009, 1017 (9th Cir. 2011) (noting that intent to defraud is not required; stating that defalcation includes a fiduciary's innocent failure to fully account for money received).  The Fifth, Sixth, and Seventh Circuits require a showing of recklessness by the fiduciary.  See In re Harwood, 637 F.3d 615, 624 (5th Cir.

2011) (stating that defalcation is a willful neglect of a duty, which does not require actual intent; it is essentially a recklessness standard); <u>In re Patel</u>, 565 F.3d 963, 970 (6th Cir. 2009) (stating that a defalcation requires a showing of more than negligence; instead, the fiduciary "must have been objectively reckless in failing to properly account for or allocate funds"); <u>In re Berman</u>, 629 F.3d 761, 766 n. 3 (7th Cir. 2011) (stating that "defalcation requires something more than negligence or mistake, but less than fraud").  The First and Second Circuits require a showing of extreme recklessness.  <u>See</u> <u>In re Baylis</u>, 313 F.3d 9, 20 (1st Cir. 2002) (stating that "defalcation requires something close to a showing of extreme recklessness"); <u>In re Hyman</u>, 502 F.3d 61, 68 (2d Cir. 2007) (stating that defalcation "requires a showing of conscious misbehavior or extreme recklessness"). The Third Circuit has not addressed the issue, and the Tenth Circuit has made the brief statement in an unpublished opinion that defalcation requires some portion of misconduct. <u>See</u> <u>In re Millikan</u>, 188 Fed. Appx. 699, 702 (10th Cir. 2006).

<u>In re Bullock</u>, 670 F.3d 1160, 1165-66 (11th Cir. 2012).

The more recent decisions on this issue note that the "fresh start" policy underlying the bankruptcy discharge, and that "exceptions to discharge under Section 523(a) are construed strictly against the objecting creditor," <u>Schlessinger</u>, 208 Fed. Appx. at 133," support the conclusion that some level of culpability must be proven to establish a defalcation.  <u>See</u>, <u>e.g.</u>, <u>In re Bullock</u>, 670 F.3d at 1166 ("[T]his Court finds that defalcation under § 523(a)(4) requires more than mere negligence.  Instead, this Court concludes that defalcation requires a known breach of a fiduciary duty, such that the conduct can be characterized as objectively reckless."); <u>In re Berman</u>, 629 F.3d 761, 765 n.3 (7th Cir. 2011) ("Defalcation can be distinguished from fraud and embezzlement on the basis that subjective, deliberate wrongdoing is not required to establish defalcation, though some degree of fault is required. . . . We have held that defalcation requires something more than negligence or mistake, but less than fraud.") (citations omitted);

Chao v. Rizzi, 2007 WL 2317335, at *3 (W.D. Pa. 2007); 5 Collier on Bankruptcy, ¶ 523.10[1][b] (16th ed. 2012).

Regardless of the issue of scienter, to be acting in a fiduciary capacity for purposes of the fraud or defalcation exception to discharge, the debtor must have been entrusted with the money or property on which the debt at issue was based.  See In re Seay, 215 B.R. 780, 787 (B.A.P. 10th Cir. 1997); In re Friedman, 298 B.R. 487, 502 (Bankr. D. Mass. 2003) ("[T]he debtor must hold funds in trust for a third party to satisfy the fiduciary relationship element of the defalcation provision of § 523(a)(4).") (citing In re Garver, 116 F.2d 176, 179 (6th Cir. 1997)).

LL Lifestyle contends that Mr. Vidal was acting in a fiduciary capacity, when he used the corporation's deposit toward the purchase of the 43' yacht in June 2007, because he was a member of its board of directors.  LL Lifestyle was incorporated under New York state law, and directors of corporations are considered fiduciaries under that state's law:

> [Directors and officers] owe the corporation their undivided loyalty and may not assume and engage in the promotion of personal interests which are incompatible with the superior interests of their corporation.  Specifically, an officer or director of a corporation may not, without consent, divert and exploit for [his or her] own benefit any opportunity that should be deemed an asset of the corporation.

Morales v. Galeazzi, 72 A.D.3d 765, 766 (N.Y. App. Div. 2010); see Higgins v. New York Stock Exchange, Inc., 806 N.Y.S. 2d 339, 357 (N.Y. Sup. 2005) ("The fiduciary duty of loyalty imposes on corporate directors an obligation not to 'assume and engage in the promotion of personal interests which are incompatible with the superior interests of their corporation . . . as they [directors] owe the corporation their undivided and

unqualified loyalty.'  Foley v. D'Agostino, 21 A.D.2d 60, 66–67, 248 N.Y.S.2d 121 (1st

Dept. 1964.)'').

     Whether a debtor's service as a corporate officer or director, without more,

creates a fiduciary relationship for purposes of section 523(a)(4) is another issue that has

divided courts.  See, e.g., Villas at Bailey Springs Homeowners Ass'n, Inc. v. LaRicci,

2011 WL 4591962, at *2 (M.D. Pa. 2011) ("Courts are divided on whether merely

serving as a corporate officer or director establishes a fiduciary relationship for purposes

of § 523(a)(4).") (footnote omitted).  I note that courts applying New York law have

accepted that a board member of a closely-held corporation is acting in a fiduciary

capacity vis-a-vis the corporation, for purposes of section 523(a)(4), when entrusted with

corporate assets or acting for the corporation:

> The law is clear that a corporate officer and director has a
> fiduciary duty to the corporation itself as well as the
> stockholders in general. . . .  First Nat'l Bank of Boston v.
> Overmyer (In re Overmyer), 52 B.R. 111, 118 (Bankr.
> S.D.N.Y. 1985) ("The liability of corporate officers and
> directors to the corporation is not dischargeable when
> bottomed on fiduciary fraud.").
>
> . . . As was already discussed, cases following New York law
> have in fact found a fiduciary relationship sufficient to meet
> the threshold question of § 523(a)(4).

In re Beeber, 239 B.R. 13, 32 (Bankr. E.D.N.Y. 1999) (citations omitted); see also In re

Hyman, 502 F.3d 61 (2d Cir. 2007) (accepting a state court ruling that a corporate officer

and director was a fiduciary for purposes of section 523(a)(4) but finding no fraud or

defalcation); In re Hammond, 98 F.2d 703 (2d Cir.), cert. denied, 305 U.S. 646 (1938)

(corporate director was acting in a fiduciary capacity when he misappropriated shares of

stock that the corporation desired to purchase).

For purposes of this adversary proceeding, I shall follow the lead of those decisions construing New York state law and section 523(a)(4), and accept the plaintiff's contention that, as a member of its board of directors in 2007, Mr. Vidal held fiduciary duties to the corporation.  LL Lifestyle failed to prove, however, that any debt to it arose from a fraud or defalcation while Mr. Vidal was acting in a fiduciary capacity.

Under New York law, a director does not breach his fiduciary duties by using corporate funds for personal purposes when such use is approved by the corporation.  See, e.g., Ward v. City Trust Co. of New York, 192 N.Y. 61, 71 (1908). Nor is there a breach of fiduciary duty by a director's exercising a corporate opportunity if that opportunity is taken with corporate consent.  See generally Owen v. Hamilton, 843 N.Y.S.2d 298, 301-02 (N.Y. App. Div. 1st 2007).

In this adversary proceeding, LL Lifestyle argues that Mr. Vidal misled it regarding his purchase of a yacht for corporate use, and misappropriated corporate funds for his own benefit, all while serving as corporate director.

For reasons set forth earlier, I have concluded that Mr. Vidal did not commit any fraud against LL Lifestyle, either in connection with the purchase of a yacht, nor with the use of the corporate deposit.  I further conclude that no defalcation was proven.

First, the evidence discloses that Mr. Vidal was never entrusted with any corporate funds.  Mr. Choi made a deposit of corporate funds with Marine Max, and then directed Marine Max to apply those funds toward the purchase of a yacht to be titled in the name of VP Maritime.  Second, New York state law permits a corporation to enter

into an agreement with an individual director.  See N.Y. Business Corporation Law §

713(a).  The statute states in relevant part:

> (a) No contract or other transaction between a corporation and
> one or more of its directors, or between a corporation and any
> other corporation, firm, association or other entity in which
> one or more of its directors are directors or officers, or have a
> substantial financial interest, shall be either void or voidable
> for this reason alone or by reason alone that such director or
> directors are present at the meeting of the board, or of a
> committee thereof, which approves such contract or
> transaction, or that his or their votes are counted for such
> purpose:

>> (1) If the material facts as to such director's
>> interest in such contract or transaction and as to
>> any such common directorship, officership or
>> financial interest are disclosed in good faith or
>> known to the board or committee, and the board
>> or committee approves such contract or
>> transaction by a vote sufficient for such purpose
>> without counting the vote of such interested
>> director or, if the votes of the disinterested
>> directors are insufficient to constitute an act of
>> the board as defined in section 708 (Action by
>> the board), by unanimous vote of the
>> disinterested directors[.]

>> ***

> (b) If a contract or other transaction between a corporation
> and one or more of its directors, or between a corporation and
> any other corporation, firm, association or other entity in
> which one or more of its directors are directors or officers, or
> have a substantial financial interest, is not approved in
> accordance with paragraph (a), the corporation may avoid the
> contract or transaction unless the party or parties thereto shall
> establish affirmatively that the contract or transaction was fair
> and reasonable as to the corporation at the time it was
> approved by the board, a committee or the shareholders.

During February and March 2007—when Mr. Choi proposed to Mr. Vidal

that he use the Marine Max deposit to purchase a smaller yacht, and then obtain the net

proceeds from the sale of that yacht, so as to repay himself a portion of his corporate

investment—the LL Lifestyle Board of Directors consisted of Mr. Choi, Mr. Lapin and Mr. Vidal.[18]  The evidence reflects that Mr. Lapin knew of Mr. Choi's proposal, ex. L-16, and did not object.  Obviously, Mr. Vidal did not object, as he testified that he accepted Mr. Choi's compromise.  Thus, under New York state law, Mr. Choi's proposal to Mr. Vidal was known and agreed to by the board of directors and approved.  Therefore, Mr. Vidal's acceptance thereof and use of the deposit would not constitute any defalcation.

Alternatively, even if the LL Lifestyle did not consent to the use of its deposit within the meaning of New York state law, Mr. Vidal's good faith belief that it did so is sufficient to rebut any finding of defalcation.  See In re Hyman, 502 F.3d at 69-70 (evidence of debtor's good faith in his use of corporate funds precludes finding of defalcation under section 523(a)(4)).

Accordingly, to the extent that Mr. Vidal was a fiduciary within the meaning of section 523(a)(4), and to the extent his actions created a "debt" owed to LL Lifestyle within the broad meaning of sections 101(12) and 523(a) of the Bankruptcy Code, this debt did not arise from any fraud or defalcation while acting in a fiduciary capacity.  See, e.g., In re Hampton, 407 B.R. 443 (table),  2009 WL 612491, at *2 (B.A.P. 10th Cir. 2009) (noting that "the bankruptcy court found creditors had failed to establish

---

[18]Mrs. Vidal was no longer a board member as of February 22, 2007.  Ex. L-14. Mr. Fieldman was no longer a director as of March 2, 2007.  Ex. L-15.  The minutes from the board meeting held on March 21, 2007 state that "[t]he open Board position will be assumed by George Pastrana."  Ex. L-16.  Mr. Pastrana was not present at that meeting and there is no evidence that he either knew of or accepted this position.  2 N.T. at 200-01.

Even if Mrs. Vidal and Mr. Pastrana were viewed as board members during this period, they, in all likelihood, would have supported Mr. Vidal's decision to accept "option 4" proposed by Mr. Choi.  Similarly, Mr. Fieldman, who did not know of the deposit until it had been made, and who opposed the purchase of another vessel and the deposit itself, 1 N.T. at 93-94, and who warned Mr. Vidal about corporate difficulties, also would have supported the exercise of this option.

that Debtor owed a fiduciary duty to them and, even assuming such a duty existed, failed

to prove that the debt in question arose as a result of fraud or defalcation.").

VI.

Finally, Count III of the second amended complaint asserts a cause of action

under section 523(a)(6), which renders any debt "for willful and malicious injury by the

debtor to another entity or to the property of another entity" nondischargeable.

The United States Supreme Court, in <u>Kawaauhau v. Geiger</u>, 523 U.S. 57

(1998), narrowly defined the phrase "willful and malicious" used in section 523(a)(6).

The Court construed section 523(a)(6) as limited in scope to intentional torts:

> The word "willful" in (a)(6) modifies the word "injury,"
> indicating that nondischargeability takes a deliberate or
> intentional *injury*, not merely a deliberate or intentional *act*
> that leads to injury.  Had Congress meant to exempt debts
> resulting from unintentionally inflicted injuries, it might have
> described instead "willful acts that cause injury."  Or,
> Congress might have selected an additional word or words,
> i.e., "reckless" or "negligent," to modify "injury."  Moreover,
> as the Eighth Circuit observed, the (a)(6) formulation triggers
> in the lawyer's mind the category "intentional torts," as
> distinguished from negligent or reckless torts.  Intentional
> torts generally require that the actor intend "the *consequences*
> of an act," not simply "the act itself."  Restatement (Second)
> of Torts § 8A, comment a, p. 15 (1964).

<u>Id.</u> at 61–62 (emphasis in original); <u>see also</u> <u>In re Markowitz</u>, 190 F.3d 455, 464 (6th Cir.

1999).

Similarly, the Third Circuit has explained: "for the injury to have been

'willed' by the debtor, it must at least have been substantially certain to result from the

debtor's act." <u>In re Conte</u>, 33 F.3d 303, 307 (3d Cir. 1994).  "We hold that actions are

53

willful and malicious within the meaning of § 523(a)(6) if they either have a purpose of producing injury or have a substantial certainty of producing injury." Id. at 307; see, e.g., In re Giarratano, 2004 WL 2827138, at *3 (D. Del. 2004); In re Jacobs, 381 B.R. 128, 144-45 (Bankr. E.D. Pa. 2008).

"As to the malice requirement, the act resulting in the injury must be 'wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill-will.'" In re Hannan, 2012 WL 3643065, at *8 (Bankr. W.D. Pa. 2012) (quoting In re Ali, 321 B.R. 685, 693 (Bankr. W.D. Pa. 2005); see, e.g., In re Adalian, 474 B.R. at 162-63; In re DiGiovanni, 446 B.R. 709, 716 (Bankr. E.D. Pa. 2011).

I recognize that some courts have held that injury caused by a corporate officer or director's misappropriation of a corporate opportunity may be considered willful and malicious for purposes of section 523(a)(6). See, e.g., In re Jacobs, 381 B.R. at 147 n.34 ("By its very nature, conduct amounting to theft of corporate opportunity is substantially certain to harm the shareholders of the corporation whose assets are being diminished."); In re Leist, 398 B.R. 595 (Bankr. S.D. Ohio 2008) (holding that economic harm suffered by corporate entity resulting from former employee's usurpation of a corporate opportunity constituted injury to an "entity or to property of another entity" for purposes of section 523(a)(6)); In re Stutsman, 163 B.R. 374 (Bankr. N.D. Okla. 1993) (holding that state court judgment finding former corporate director liable for usurping a corporate opportunity was nondischargeable under section 523(a)(6)),

I further appreciate that injury to a corporation caused by a director or officer's misappropriation of corporate assets for use in a competing venture has also

been determined to be nondischargeable under section 523(a)(6).  See In re Robustelli,

430 B.R. 709 (Bankr. N.D. Ga. 2011).

In this adversary proceeding, LL Lifestyle has alleged that Mr. Vidal

misappropriated corporate assets for his own benefit and used them to usurp a corporate

opportunity and establish a competing entity, all to the detriment of the plaintiff.  Based

upon the findings made earlier, the evidence does not support that the debtor acted

willfully and maliciously, as required by section 523(a)(6).

First, as concerns the Marine Max deposit, for the reasons stated above, I

find that Mr. Vidal used the deposit with the consent of LL Lifestyle.  Under New York

law, a director may lawfully utilize corporate funds and usurp a corporate opportunity if

done with the consent of the board of directors. See Owen v. Hamilton, 843 N.Y.S.2d

301-02; Ward v. City Trust Co. of New York, 192 N.Y. at 71.  Alternatively, even if there

was no corporate consent within the scope of state law, Mr. Vidal had a good faith belief

that he was authorized to make use of that deposit.  As a result, any technical conversion

of corporate property was not malicious.  See In re Held, 734 F.2d 628, 630 (11th Cir.

1984) ("Upon considering this question the bankruptcy court found that the conversion

was not willful or malicious and that defendants acted in a good faith though mistaken

belief that their agreement with plaintiff authorized their actions. These findings are not

clearly erroneous."); see also Davis v. Aetna Acceptance Co., 293 U.S. 328, 332 (1934)

("There may be a conversion which is innocent or technical, an unauthorized assumption

of dominion without wilfulness or malice."); In re Peklar, 260 F.3d 1035, 1039 (9th Cir.

2001) (same).  Similarly, the debtor either had corporate approval, or believed in good

faith that such consent was given, for his purchase of the 43' Azimut yacht for his own

purposes in order to recover a portion of his corporate investment.  His failure to agree to

lease terms proposed by the plaintiff does not constitute willful and malicious conduct.

Therefore, LL Lifestyle has not met its evidentiary burden for relief under

section 523(a)(6).


## VII.


In sum, LL Lifestyle had the burden to demonstrate not only that it held a

claim against Mr. Vidal, but that any such claim was outside the scope of the debtor's

chapter 7 discharge under various provisions of section 523(a).  The plaintiff raised three

alternative grounds for such relief: 11 U.S.C. § 523(a)(2), (a)(4), and (a)(6).

After consideration of the evidence presented, I find that the debtor—who

invested $400,000 in LL Lifestyle, and who later believed that the corporate financial

information provided to him prior to that investment was inaccurate and so sought some

redress—agreed to a compromise proposal to him made by the plaintiff's largest

shareholder, director and chief executive officer, which proposal and his consent thereto

either were known in whole or in part by the other corporate director.  The actions he took

in accepting that proposal were neither fraudulent, a defalcation, embezzlement, larceny

nor willful and malicious.

Accordingly, judgment will be entered in favor of the debtor/defendant and

against the plaintiff.  Any debt the plaintiff holds against the debtor will be discharged

under 11 U.S.C. §§ 524(a) and 727.

_____
BRUCE FOX
United States Bankruptcy Judge

Dated: September 6, 2012